**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| DEBRA GAHM, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>WINGS FINANCIAL CREDIT UNION,<br><br>Defendant. | Civ. No.  25-2017 (JRT/EMB)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |

J. Gerard Stranch IV, Martin F. Schubert, **STRANCH, JENNINGS & GARVEY, PLLC**, 223 Rosa L. Parks Avenue, Suite 200, Nashville, TN 37203; Karen Hanson Riebel, Kate M. Baxter-Kauf, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Lisa La Fornara, Lynn A. Toops, **COHEN & MALAD, LLP**, One Indiana Square, Suite 1400, Indianapolis, IN 46204, for Plaintiff.

Lisa Lamm Bachman and Paul W. Magyar, **FOLEY & MANSFIELD, PLLP**, 250 Marquette Avenue, Suite 540, Minneapolis, MN 55401, for Defendant.

Plaintiff Debra Gahm initiated this putative class action against Defendant Wings Financial Credit Union ("Wings"), alleging that Wings violated various statutory and regulatory requirements by failing to properly notify its customers of its overdraft fee practices.  Gahm asserts that Wings' disclosure practices violated (1) the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.* and Regulation E, 12 C.F.R. § 1005 *et seq.* as well as (2) the Minnesota Consumer Fraud Act ("MCFA")*.*

Defendant Wings seeks dismissal of Gahm's Second Amended Complaint under Rule 12(b)(6) for failure to state a claim.  After careful consideration, the Court will grant in part and deny in part Wings' motion to dismiss.  With respect to Gahm's EFTA and Regulation E claim, the Court concludes that Wings' Opt-in Form is ambiguous, fails to contain required information, and is not substantially similar to Model Form A-9.  To the extent the claim relates to overdraft charges before January 30, 2022, the Court will, however, grant Wings' motion to dismiss the EFTA and Regulation E claim as time-barred; but the Court will deny the motion to the extent the claim relates to overdraft charges on or after January 30, 2022.  The Court will also deny Wings' motion to dismiss as to Gahm's MCFA claim because Gahm plausibly alleges fraudulent or misleading business practices, and she does so with the required particularity.

**BACKGROUND**

**I.    STATUTORY AND REGULATORY BACKGROUND**

In 1978, Congress passed the EFTA, codified at 15 U.S.C. § 1693 *et seq.*, to outline the rights and responsibilities of customers and institutions that use electronic transfer systems.  15 U.S.C. § 1693(b).  Regulation E, 12 C.F.R. § 1005.1, *et seq.*, implements the EFTA.  12 C.F.R. § 1005.1.  Regulation E seeks to help customers "understand[] how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs."  *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1234 (11th Cir. 2019) (quoting Electronic Fund Transfers, 74 Fed.

Reg. 59,033, 59,035 (Nov. 17, 2009)).  By ending automatic enrollment in overdraft protection, Regulation E mandates that institutions obtain customers' "affirmative consent" through an opt-in disclosure.  *Id.* (citation omitted).

Regulation E addresses requirements for overdraft services.  *See* 12 C.F.R. § 1005.17.  An "overdraft service" is "a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account."  12 C.F.R. § 1005.17(a).

Regulation E establishes an opt-in requirement for overdraft services.  *Id.* § 1005.17(b).  A financial institution may not assess or charge a customer an overdraft fee unless four conditions are met.  *Id.*  First, the institution must provide the customer with a written or electronic notice "segregated from all other information, describing the institution's overdraft service[.]"  *Id.* § 1005.17(b)(1)(i).  Second, the customer must be given a "reasonable opportunity" to "affirmatively consent" to the overdraft service.  *Id.* § 1005.17(b)(1)(ii).  Third, the institution must secure the customer's affirmative consent.  *Id.* § 1005.17(b)(1)(iii).  Fourth, the institution must give the customer confirmation of the customer's consent that informs them of their right to revoke such consent.  *Id.* § 1005.17(b)(1)(iv).

Moreover, a financial institution cannot condition the provision of other overdraft services on a consumer consenting to overdraft services for ATM and one-time debit card

transactions, and the financial institution must provide consumers who do not consent "the same account terms, conditions, and features that it provides to consumers who affirmatively consent . . . ." *Id.* § 1005.17(b)(2)–(3).

Regulation E also imposes several requirements regarding the content and format of the notice describing the institution's overdraft service. *Id.* § 1005.17(d). The notice must be substantially similar to Model Form A-9, and it must contain the items set forth in § 1005.17(d)(1)–(6). *Id.* § 1005.17(d). Section 1005.17(d)(1) requires a brief description of the overdraft service and types of transactions to which it applies. The financial institution must also disclose the fees imposed, including a dollar amount or, if the fee is dependent on the amount of times an account is overdrawn, a maximum fee that can be imposed. *Id.* § 1005.17(d)(2). Additionally, the maximum number of overdraft fees that may be assessed each day must be disclosed, "or, if applicable, that there is no limit." *Id.* § 1005.17(d)(3). Section 1005.17 (d)(4) requires disclosure of the consumer's right to affirmatively consent to the overdraft service, as well as how to do so. The financial institution must also disclose alternative plans for covering overdrafts. *Id.* § 1005.17(d)(5). Section 1005.17(d)(6) states the ways in which the financial institution may modify the required content or include additional content. The Notice "may not contain any information not specified in or otherwise permitted by" § 1005.17(d)(1)–(6). *Id.* § 1005.17(d).

15 U.S.C. § 1693m(a) imposes civil liability on those that fail to comply with EFTA's provisions. Any action that arises under the EFTA must be brought "within one year from the date of the occurrence of the violation." 5 U.S.C. § 1693m(g).

## II.    FACTUAL BACKGROUND

Wings offers overdraft protection to its members through Overdraft Protection Plus, and if a member is enrolled in Overdraft Protection Plus for debit-card transactions, Wings may elect to pay the overdraft and assess an overdraft fee. (*See generally* Second. Am. Compl. ("SAC"), May 6, 2025, Docket No. 1-57.) To enroll in Overdraft Protection Plus, a member must opt-in and agree to the terms of Wings' Overdraft Protection Plus Agreement & Disclosure using Wings' Opt-in Form. (*Id.* ¶¶ 3, 5.) Before addressing Wings' disclosure forms, the Court will describe the type of financial transactions at issue— signature debit card transactions.

### A.    Signature Debit Card Transactions

A signature debit card transaction occurs when customers use their debit cards without entering their PIN and the transaction is processed through credit card networks.[1] (*See id.* ¶ 40 & Ex. F.) Signature debit card transactions occur in two parts. (*Id.* ¶ 40.)

---

[1] PIN transactions—transactions in which the user enters their PIN number—are implicated here because in PIN transactions, the account's funds are withdrawn immediately. (*See* SAC, Ex. F ("Debit card purchases and ATM withdrawals made using a PIN subtract the funds immediately from your account[.]").)

The first step is known as "authorization." (*Id.*)  When a customer uses their debit card without inputting their PIN, the merchant's payment terminal connects, through an intermediary, to Wings and requests that Wings authorize the transaction. (*Id.*)  If Wings authorizes the transaction, Wings places a hold on the customer's account in the amount authorized and reduces the customer's **available** balance by that amount. (*Id.* ¶ 41.)  The funds are not yet transferred to the merchant (*id.* ¶ 42); during the first authorization step, the customer's **actual** balance remained unchanged (*id.* ¶ 45).

The second step, "settlement," occurs when the funds are actually transferred from the customer's Wings account to the merchant's account. (*Id.* ¶ 42.)  Although authorization and settlement are distinct steps, Wings' determination of whether to pay a transaction can be made only at the time of authorization. (*Id.* ¶ 43.)  At settlement, Wings has no discretion and must pay the charge. (*Id.*)  That is, if Wings authorizes a signature debit card transaction, it must pay the merchant. (*Id.*)  Because the transferred funds were held at authorization, the account's **available** balance does not change at settlement, meaning that the transaction can be settled without creating an overdraft. (*Id.* ¶¶ 44–45.)  But at settlement, the account's **actual** balance is reduced. (*Id.*)

Several days may pass between authorization and settlement. (*Id.* ¶ 46.)  Because of the time delay, Gahm alleges that it is critical that financial institutions inform

consumers whether overdraft decisions are based on the balance at authorization or the balance at the time of settlement.[2] (*Id.* ¶ 47.)

### B.    Wings' Overdraft Service Forms

Wings had two forms relevant to its Overdraft Protection Plus service: (1) Wings' Opt-in Form and Wings' Overdraft Protection Plus – Agreement & Disclosure ("A&D") Form. (*Id.* ¶¶ 72, 77.) The first versions of the forms were effective as of June 9, 2016. (*Id.*, Exs. B, F.) The second versions of the forms, which replaced the June 2016 forms, were effective on April 2, 2018. (*Id.*, Exs. A, E; *see also* Decl. of Lisa Daum ("Daum Decl.") ¶ 3, May 13, 2025, Docket No. 7.) Wings amended the A&D Form again, effective August 1, 2019. (SAC, Ex. D; Daum Decl. ¶ 4.) On October 26, 2022, Wings amended both forms. (SAC, Ex. C; Daum Decl. ¶ 5, Ex. 1.) Finally, Wings established Overdraft Protection Plus Digital Agreement & Terms of Service, which became effective in March 2024 and superseded both the Opt-in Form and the A&D Form. (SAC ¶ 65; *see also* Daum Decl. ¶ 6, Ex. 2.)

---

[2] Transactions where "a customer's account has a sufficient available balance to cover a debit card transaction when the transaction is authorized but, due to one or more intervening transactions, has an insufficient available balance to cover the transaction at the time it settles" are also referred to as APSN transactions; overdraft fees are incurred when transactions are "authorized positive," but "settle negative." (*See* SAC ¶¶ 55, 57.)

### 1.    Opt-in Form

Wings' Opt-in Form informs customers that by opting in to Overdraft Protection Plus, they are agreeing to the terms of the A&D Form.  (SAC, Ex. B.)[3]  Among other things, the notice states that "[b]y opting in to Overdraft Protection Plus, you: [g]ive your consent for Wings Financial Credit Union to pay or authorize transactions against non-sufficient funds" and "[a]gree to pay a $30 Overdraft Protection Plus fee for each item that we pay that would overdraw your checking account."  (*Id.*)

### 2.    Account and Disclosure Form

Wings' A&D Form outlines its overdraft program, Overdraft Protection Plus, by detailing what a member consents to when "opting in," including the overdraft fee amount, the transaction threshold below which the fee is waived, and the priority order applied when multiple overdraft protection sources are available.  (SAC, Ex. F.)  The A&D Form then describes its service limitations, including the maximum number of Overdraft Protection Plus fees per day:

> Wings is not obligated to pay any item presented for payment if your account does not contain sufficient collected funds. However, rather than automatically returning, unpaid, any non-sufficient funds items that you may have, if your eligible account is in "good standing", which includes at least

---

[3] Because the SAC alleges that Gahm was charged overdraft fees beginning on March 31, 2017, the parties appear to agree that the applicable Opt-in and A&D forms are those that became effective on June 9, 2016.  (SAC ¶ 70; *see also* Def.'s Mem. Supp. Mot. Dismiss at 27, May 13, 2025, Docket No. 6; Pl.'s Mem. Opp. Mot. Dismiss at 9, July 21, 2025, Docket No. 22.) Accordingly, unless stated otherwise, the "Opt-In Form" and the "A&D Form" refer to June 2016 forms, Exhibits B and F to the SAC, respectively.

continuing to make deposits consistent with your past practices and not subject to any of the limitations above, we will consider – as a discretionary courtesy (not a right of yours or an obligation on our part) approving your reasonable overdraft. This discretionary courtesy will generally be limited to a $600 overdraft (negative) balance. You can only be charged a maximum of six (6) Overdraft Protection Plus fees per day per account.

Wings may refuse to pay an overdraft or terminate your access to this service at any time, even though your account is in good standing, and even though we have previously paid overdrafts for you.

(*Id.*) After explaining how a customer can opt-out, the A&D Form defines two types of account balances Wings uses to determine whether a transaction will result in an overdraft—actual balance and available balance. (*Id.* Ex. F.) The A&D Form states that Wings relies on the **available-balance** method to decide whether a transaction triggers an overdraft and a corresponding fee:

> **Understanding Your Account Balance for Overdrafts**
> Your checking account has two kinds of balances: the "actual" balance and the "available" balance. Both balances are accessible online, by phone or at a branch. We use the available balance when determining whether a transaction will cause your account to overdraw and for charging Overdraft Protection Plus fees.
>
> **Your Actual Balance**
> Your actual balance is the amount of money that is actually in your account at any given time. Your actual balance reflects transactions that have "posted" to your account but it does not include transactions that have been authorized and are pending. While it may seem that the actual balance is the most up-to-date display of the funds that you can spend from your account, this is not always the case. Your account may have purchases, holds, fees, other charges, or deposits that

have not yet posted and, therefore, will not appear in your actual balance.

**Your Available Balance**
Your available balance is the amount of money in your account that is available to you without incurring an Overdraft Protection Plus fee.  Your available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card transactions) that we have authorized but that have not yet posted to your account.

(*Id.*)  Wings, in the A&D Form, then includes an example of how an Overdraft Protection

Plus fee may be incurred, despite a positive actual balance:

**Example of Overdraft Protection Plus Fee for Insufficient Available Balance**
If your actual balance and available balance are both $100 and you swipe your debit card at a restaurant for $35, a hold is placed on your account and your available balance will be reduced to $65.  Your actual balance is still $100 because the transaction has not yet posted to your account.  If a check that you had previously written for $75 clears through your account before the restaurant charge is sent to us for processing, you will incur an Overdraft Protection Plus fee. This is because your available balance was $65 when the $75 check was paid.  In this case, we may pay the $75 check and charge you an Overdraft Protection Plus fee.  The Overdraft Protection Plus fee will also be deducted from your account, further reducing your balance.

(*Id.*)  The A&D Form then details how transactions are posted to a member's account,

noting that the posting process and timing influence the member's available balance and,

consequently, whether an overdraft fee will be charged.  (*Id.*)  The A&D Form concludes

by detailing how debit card authorization holds operate, emphasizing that they decrease

the available balance upon authorization, even though the actual balance is not reduced

until posting, thereby affecting the assessment of overdraft fees:

> **What is a debit card authorization hold?**
> When you use your debit card to conduct a Signature or
> "Credit" transaction (i.e., you do not enter your PIN), the
> merchant sends us the amount, usually the purchase total, for
> authorization.  This amount is placed on hold and removed
> from your available balance immediately.  The hold is released
> after approximately 72 hours or when the transaction clears,
> whichever comes first.   The hold helps determine the
> available balance on your account.
>
> **Will debit card authorization holds apply to all my
> purchases?**
> No, debit card authorization holds only apply to debit card
> transactions when you sign your name or do not enter a PIN.
> For example, a debit card purchase made at a restaurant or
> with an online merchant would be treated as a
> signature/credit transaction and would be subject to an
> authorization hold.
>
> Debit card purchases and ATM withdrawals made using a PIN
> subtract the funds immediately from your account (except
> when you use your PIN at a gas station).

(*Id.* Ex. F.)  Wings also described its Overdraft Protection Plus program on its website and

explained that it "is designed to cover the payment of checks and ACH debits, even when

your current balance is insufficient."  (SAC, Ex. G.)  The website page also informed

customers that they "can opt in to have debit card transactions and ATM withdrawals

covered."  (*Id.*)

-11-

### III.    PROCEDURAL BACKGROUND

Wings charged Gahm overdraft fees on one-time debit card transactions and ATM transactions on various occasions from 2017 to 2023.[4]  (SAC ¶¶ 69–70.)  Gahm initiated this putative class action in state court on January 30, 2023.[5]  (Compl., May 6, 2025, Docket No. 1-2.)  Gahm then filed an Amended Complaint November 15, 2023.  (Am. Compl., May 6, 2025, Docket No. 1-24.)  Wings subsequently moved to dismiss the

---

[4] Gahm alleges that she was assessed $30 overdraft fees on one-time card transactions and ATM transactions on at least the following dates: March 31, 2017; May 22, 2017; June 20, 2017; September 25, 2017; September 28, 2017; October 26, 2017; January 13, 2018; January 22, 2018; February 2, 2018; April 27, 2018; April 28, 2018; May 2, 2018 (two times); May 3, 2018; May 18, 2018; August 13, 2018; August 20, 2018; August 24, 2018; August 28, 2018; August 30, 2018; March 22, 2019 (two times); March 23, 2019; April 12, 2019 (two times); April 13, 2019; August 30, 2019; November 29, 2019; May 7, 2020; July 10, 2020; August 7, 2020; October 17, 2020; December 2, 2021; December 6, 2021; April 19, 2022; June 10, 2022 (three times); November 12, 2022; June 26, 2023; September 5, 2023; September 20, 2023; November 6, 2023; and December 2, 2023.  (SAC ¶ 70.)  Gahm alleges in the SAC that during these times, Wings' allegedly insufficient Opt-in Form was included in her contract.  (*Id.*)

[5] Gahm seeks to represent two classes of individuals:

> The Opt-In Class: All consumers who, during the applicable statute of limitations, were checking accountholders of Defendant and were assessed an overdraft fee on a debit card or ATM transaction from January 30, 2022 to March 31, 2024.

> The Minnesota Class: All citizens of Minnesota who, during the applicable statute of limitations, were checking accountholders of Defendant and were assessed an overdraft fee on a transaction that did not overdraw the account from January 30, 2017 to the present.

(SAC ¶ 99.)  Excluded from the putative classes are Wings' "officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns" as well as "any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff."  (*Id.* ¶ 100.)

Amended Complaint on November 29, 2023. (Docket No. 1-27.) On March 18, 2024, Wings withdrew its motion to dismiss, one week before the hearing on the motion. (Docket No. 1-36.) After additional discovery, Gahm filed a motion for leave to amend on November 8, 2024, which the district court granted on April 15, 2025. (Docket Nos. 1-46, 1-56.) On April 22, 2025, Gahm filed and served the Second Amended Complaint. (Docket No. 1-57.)

On May 6, 2025, Wings removed the case to federal court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. (Notice of Removal, May 6, 2025, Docket No. 1.) Wings now moves to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (Mot. to Dismiss, May 13, 2025, Docket No. 4.)

## DISCUSSION

### I.   STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A pleading that offers labels and

-13-

conclusions or a formulaic recitation of the elements of a cause of action will not do."

*Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).  The Court may also consider matters of public record and exhibits attached to the pleadings, as long as those documents do not conflict with the complaint.  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

## II.    ANALYSIS

The Second Amended Complaint alleges that Wings' disclosure practices violated (1) the EFTA and its implementing Regulation E and (2) the MCFA.  (SAC ¶¶ 112–132.) Wings argues that Gahm fails to allege that Wings violated the EFTA or Regulation E and that such a claim is time-barred under 15 U.S.C § 1693m(g), which imposes a one-year statute of limitations on EFTA claims.  Wings further argues that Gahm's MCFA claim should be dismissed because Gahm fails to plausibly allege fraud or to allege her claim with particularity, as required by Federal Rule of Civil Procedure 9(b).

### A.    EFTA and Regulation E Claim

According to Wings, the SAC alleges five violations of 12 C.F.R. § 1005.17: (1) Wings unlawfully relies on the A&D Form language; (2) Wings fails to explain whether it bases

its overdraft determination on available balance method or actual balance method; (3) Wings fails to specify a daily limit on overdraft fees; (4) Wings does not plainly describe the timing or method of overdraft determinations since the Opt-in Form does not state whether overdrafts are assessed at authorization or settlement; and (5) the Opt-in Form is not substantially similar to Model Form A-9.  (Def.'s Mem. Supp. Mot. Dismiss at 15–16, May 13, 2025, Docket No. 6 (citing and quoting the SAC).)

Relying on this characterization, Wings argues that it properly relies on the A&D Form and that Gahm fails to allege an EFTA and Regulation E violation because the A&D Form plainly states that Wings uses the available balance method, indicates the maximum number of overdraft fees that may be charged per day, and explains that the overdraft fee determination is made at authorization.  Wings further maintains that both the A&D Form and the Opt-In Form are substantially similar to Model Form A-9.

For the reasons set forth below, the Court is not persuaded.  The A&D Form is not part of the segregated notice required by Regulation E and is therefore irrelevant to the compliance analysis.  After careful consideration, the Court concludes that Gahm plausibly alleges a violation of Regulation E because of deficiencies in Wings' Opt-in Form. The Court will first address Regulation E's segregation requirement, then will turn to the merits of Gahm's EFTA and Regulation E claim, and finally will consider the applicability of the EFTA's statute of limitations.

-15-

### 1.    Segregation Requirement

Before the Court can evaluate whether Gahm plausibly alleges a Regulation E violation, the Court must determine which documents can be considered as part of its analysis.  Wings argues that the Opt-in Form and the A&D Form should be considered together when evaluating whether Wings complied with Regulation E.   The Court disagrees.

Under Regulation E, the notice must be "segregated from all other information, describing the institution's overdraft service[.]"  12 C.F.R. § 1005.17(b)(1)(i).  The notice must also be "substantially similar" to Model Form A-9.  *Id.* §1005.17(d).  The notice must be "clear and readily understandable."  *Id.* § 1005.4.  The purpose of the segregation requirement is "[t]o ensure that the consumer is able to make an informed choice when opting into overdraft services for ATM and one-time debit card transactions, and that the terms of the overdraft service are not obscured by other account information . . . ." Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,042 (Nov. 17, 2009).

To skirt the segregation requirement, Wings argues that the Opt-in Form and the A&D Form, collectively, constitute the segregated notice.  The Court rejects this argument and declines to construe the Opt-in Form in conjunction with the A&D Form.  Indeed, as pointed out by Gahm, if the A&D Form was considered to be a part of the segregated notice, Wings would risk violating the substantial similarity requirement because the A&D Form bears little resemblance to Model Form A-9.  *See id.* § 1005.17(d) (requiring the

notice to be "substantially similar to Model Form A-9").[6]   Wings' A&D Form contains disclosures beyond those allowed under § 1005.17(d), including representations that the institution may terminate overdraft protection, close customer accounts, report customers to credit bureaus if overdrafts are not repaid within 45 days, and recover any costs of collection including costs and attorneys' fees.  (SAC, Ex. F.)  *See also* 12 C.F.R. § 1005.17(d) (providing that the notice must "include all applicable items [listed in § 1005.17(d)(1)–(6)], and may not contain any information not specified in or otherwise permitted by this paragraph").

At this stage in the proceedings, the Court will evaluate Gahm's Regulation E claim by looking solely to Wings' Opt-in Form.  The A&D Form is therefore irrelevant to whether Wings' Opt-in Form complied with Regulation E.  Although no binding precedent has squarely addressed whether an Opt-in Form may be construed alongside other documents (e.g., Wings' A&D Form), several federal courts have concluded—and this Court agrees—that the Opt-in Form must be assessed on its own when assessing

---

[6] 12 C.F.R. § pt. 1005, app. A (Model Form A-9).

-17-

compliance with Regulation E.[7]   Accordingly, Court will consider Wings' Opt-in Form

alone, not the A&D Form, in determining whether Gahm plausibly alleges a Regulation E

violation.

### 2.   Merits of Gahm's EFTA and Regulation E Claim

Regulation E's opt-in requirement provides that "a financial institution holding a

consumer's account shall not assess a fee or charge on a consumer's account for paying

an ATM or one-time debit card transaction pursuant to the institution's overdraft service"

unless certain conditions are met.   12 C.F.R. § 1005.17(b)(1).   Such conditions include

providing (1) providing "the consumer with a notice in writing, or if the consumer agrees,

electronically, segregated from all other information, describing the institution's

overdraft service" and (2) "obtain[ing] the consumer's affirmative consent, or opt-in, to

the institution's payment of ATM or one-time debit card transactions[.]"   *Id.*

§ 1005.17(b)(1)(i), (iii).   Regulation E also adds to the Opt-in requirement by requiring that

all disclosures be "clear and readily understandable."   *Id.* § 1005.4(a)(1).   Read together,

---

[7] *See, e.g.*, *Ramirez v. Baxter Credit Union*, Civ. No. 16-3765, 2017 WL 118859, *8 (N.D. Cal. Jan. 12, 2017) ( "Regulation E specifically governs the requirements of the opt-in form on its own, and plaintiff has properly alleged that [defendant's] opt-in form is facially deficient."); *Adams v. Liberty Bank*, Civ. No. 20-1601, 2021 WL 3726007, at *3–4 (D. Conn. Aug. 23, 2021) (noting that because of the segregation requirement, "a faulty notice is not saved by clarifying language in other documents"); *Grenier v. Granite State Credit Union*, 570 F. Supp. 3d 18, 22 (D.N.H. 2021) ("The Membership Agreement is extraneous information, irrelevant to whether the Opt-in Disclosure itself—i.e., the segregated document—adequately explains Granite's overdraft policy."); *Virgina is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 449 (E.D. Va. 2024) (same, citing *Grenier*).

a financial institution cannot charge overdraft fees without the customer's affirmative consent following a clear, understandable disclosure.

Gahm alleges that Wings' Opt-in Form fails to meet Regulation E's requirements, and because the Opt-in Form does not satisfy Regulation E, Wings lacked authority to assess overdraft fees.  Specifically, Gahm contends that the Opt-in Form (1) fails to explain **how** Wings determines whether a transaction incurs an overdraft; (2) fails to explain **when** the overdraft determination is made—at authorization or settlement; (3) fails to identify the maximum number of fees that Wings may assess per day; and (4) is not substantially similar to Model Form A-9.  The Court agrees and will address each of Gahm's contentions.

**First**, Gahm argues that the Opt-in Form fails to explain how Wings determines whether a transaction creates an overdraft.  The Opt-in Form states that by opting in, the customer gives their consent for Wings "to pay or authorize transactions against **non-sufficient funds** up to your approved limit" and to impose "a $30 Overdraft Protection Plus fee for each item that we pay that would overdraw your checking account."  (SAC, Ex. B.)  The Opt-in Form fails to define "non-sufficient funds" or to clarify whether an overdraft fee is triggered when the **actual balance** or the **available balance** is overdrawn.  As the A&D Form makes clear, these are two distinct balances: the actual balance reflects only posted transactions, while the available balance includes authorized but unposted transactions.  (SAC, Ex. F.)  This distinction is critical.  Because the available balance may

-19-

be lower than the actual balance, a customer can be charged an overdraft fee even when the account in fact contains sufficient funds.  By omitting any reference to the balance Wings uses to make its overdraft determination, the Opt-in Form deprives consumers of the information needed to understand how a transaction may trigger overdraft.  The Court therefore concludes that Gahm has plausibly alleged a Regulation E claim because Wings failed to explain in a "clear and readily understandable" manner whether overdraft fees would be charged based on the available or actual balance.  12 C.F.R. § 1005.4(a)(1); *see, e.g.*, *Tims*, 935 F.3d at 1243–44 (concluding that a notice was not described in "clear and readily understandable" way when the notice did not distinguish between the available and actual balance); *Wellington v. Empower Fed. Credit Union*, 533 F. Supp. 3d 64, 70 (N.D.N.Y. 2021) ("[A] plaintiff plausibly alleged a violation of Regulation E when the financial institution did not adequately define whether overdraft fees would be assessed based on the available balance or actual balance."); *Fludd v. S. State Bank*, 566 F. Supp. 3d 471, 483 (D.S.C. 2021).

**Second**, Gahm asserts that the Opt-in Form fails to explain when the overdraft determination is made.  As previously noted, the Opt-in Form states that by opting in, the customer gives their consent for Wings "to pay or authorize transactions against non-sufficient funds up to your approved limit."  (SAC, Ex. B.)  Nowhere does the Opt-in Form specify whether the overdrafts are assessed at authorization or at settlement.  As a result, consumers may be uncertain whether sufficient funds are required at the time of the

-20-

transaction (i.e., authorization) or at settlement.  Accordingly, the Court finds, consistent with other courts, that such ambiguity is sufficient to state a Regulation E claim.  *See, e.g.*, *Virgina is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 449 (E.D. Va. 2024) (concluding that plaintiff stated Regulation E violation when the opt-in form did not specify whether overdrafts were assessed at settlement or authorization); *Hinton v. Atl. Union Bank*, Civ. No. 3:20-651, 2020 WL 9348205, at *3 (E.D. Va. Nov. 2, 2020).[8]

**Third**, Gahm alleges that the Opt-in Form fails to identify the maximum number of overdraft fees that may be assessed daily.  Regulation E requires that the Opt-in notice specify the "[t]he maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit."  12 C.F.R. § 1005.17(d)(3).  But nowhere does Wings' Opt-in Form specify the daily limit.  Therefore, Gahm plausibly alleges a Regulation E violation; that is, Wings' Opt-in Form fails to "describ[e] the institution's overdraft service," *see id.* § 1005.17(b)(1)(i), in a "clear and readily understandable" way, *see id.* § 1005.4(a)(1).

**Fourth**, Gahm contends that Wings' Opt-in Form is not substantially similar to Model Form A-9.  Because the Opt-in Form omits content required by § 1005.17(d) such

---

[8] Wings contends that because a debit card transaction can only be approved at authorization, it is clear that the overdraft determination is made at authorization. (Reply Mem. Supp. Mot. Dismiss at 5, Aug. 11, 2025, Docket No. 24.)  Although this may be true upon review of the A&D Form, a customer would not be able to reach this conclusion reviewing the Opt-in Form alone.  As discussed, *supra* Discussion II.A.1., the A&D Form is irrelevant for the purposes of analyzing Gahm's Regulation E claim, and the Court must review the Opt-in Form as a standalone document.

as the daily limit of overdraft fees, Gahm sufficiently alleges that the Opt-in Form is not "substantially similar to Model Form A-9." *See id.* § 1005.17(d).  To the extent Wings argues that the A&D Form satisfies § 1005(d), the Court cannot consider the A&D Form because, as previously discussed, it is not the separate, segregated notice contemplated by § 1005.17(b)(1)(i).  And, even if the Court were to review the A&D Form, it would likely fail the substantial-similarity standard: the A&D Form spans three pages—unlike the single-page Model Form A-9—and the A&D Form includes information beyond what § 1005.17(d) requires, rendering the additional content impermissibly extraneous.

In sum, to satisfy Regulation E, a financial institution's opt-in form must include a "brief description of the financial institution's overdraft service" as well as other certain types of information under 12 C.F.R. § 1005.17(d).  Gahm pleads her Regulation E claim by plausibly alleging that Wings' Opt-in Form does not accurately describe the institution's actual overdraft practice.  At minimum, Gahm alleges that the Opt-in Form is ambiguous and omits required information, and thus it is "plausible that the notice does not describe the overdraft service in a 'clear and understandable way.'"  *See Tims*, 935 F.3d at 1243–44 (quoting 12 C.F.R. § 1005.4(a)(1)).  As a result, Gahm sufficiently alleges that Wings did not provide her with a reasonable opportunity to affirmatively consent to Wings' Overdraft Protection Plus service because the notice did not provide Gahm with "all the information she need[ed] to give plain and clear consent."  *See id.* at 1244.

Accordingly, construing the facts in the light most favorable to Gahm, the Court concludes that Gahm plausibly states an EFTA and Regulation E claim.

### 3. Statute of Limitations

In addition to arguing that Gahm fails to allege an EFTA and Regulation E claim on the merits, Wings argues that Gahm's EFTA and Regulation E claim should be dismissed as time barred under 5 U.S.C. § 1693m(g), which establishes a one-year statute of limitations for EFTA claims. Specifically, Wings argues that Gahm's EFTA and Regulation E claim accrued on March 31, 2017—the date Gahm was first charged an overdraft fee on a debit card or ATM transaction—and expired on March 31, 2018. Because Gahm did not file her original complaint until January 2023, Wings contends her claim is time-barred.

EFTA claims must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). In general, the statute of limitations is triggered once the "plaintiff has a complete and present cause of action," which does not occur until the "plaintiff can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California*, 522 U.S. 192, 201 (1997) (internal quotation marks omitted). No circuit court nor any courts in this District have opined on the proper interpretation of 15 U.S.C. § 1693m(g). Courts that have addressed the issue are divided between two approaches—one exemplified by *Smith v. Bank of Hawaii*, Civ. No. 16-513, 2018 WL 1662107 (D. Haw. Apr. 5, 2018), and the other by *Domann v. Summit Credit Union*, Civ. No. 18-167, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018).

-23-

### a.   *Smith* Approach

Gahm argues that the Court should adopt the approach followed by the district court in *Smith*.  Gahm asserts that each wrongful overdraft fee is a separate EFTA violation that triggers the one-year statute of limitations period.  In support, Gahm relies on *Fludd v. S. State Bank*, 566 F. Supp. 3d 471 (D.S.C. 2021).  In *Fludd*, the court rejected a bank's argument that the "limitations period begins to run on the date of the first noncompliant transfer."  *Id.* at 480 (internal quotation marks omitted).  The court distinguished the cases cited by the bank on the grounds that such cases involved in a "series of *preauthorized*, *recurring* transactions."  *Id.* at 481.  In contrast, in *Flood*, the case involved "*non-recurring* debit card and ATM transactions."  *Id.*  In reaching its conclusion, the *Fludd* court adopted the reasoning of *Smith*, 2018 WL 1662107.

In *Smith*, the court explained the rationale for distinguishing between pre-authorized recurring transactions and non-recurring debit card transactions:

> The difference between preauthorizing a series of transfers and opting in to an overdraft service is both significant and meaningful.  In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account.  But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.
>
> And Regulation E reflects these differing factual circumstances.  It requires a preauthorized transfer to be in writing, focusing on the authorization itself.  12 C.F.R. § 1005.10(b).  But with regard to the overdraft services, it focuses not only on the requirements for a consumer's opt-in, but it also expressly prohibits "any fee or charge on the

-24-

> consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service" unless proper disclosure is made.  12 C.F.R. § 1005.17(c)(2); *accord* 12 C.F.R. § 1005.17(b)(1) (providing "a financial institution holding a consumer's account *shall not assess a fee or charge* on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service *unless*" it complies with its disclosure obligations) (emphasis added).  Thus, the *violation* for purposes of determining the limitation period for a preauthorized transfer may properly be characterized as an omission.  But when a bank assesses overdraft fees or charges, it violates the express language of Regulation E every time it imposes a fee or charge.

*Smith*, 2018 WL 1662107, at *5.  Because of the differences between pre-authorized recurring transactions and non-recurring debit card transactions, *Smith* concluded that Smith's EFTA claim was barred only to the extent his claim was based on overdraft fees that were assessed outside the one-year limitations period.  *Id.* at *6.  In addition to *Fludd*, numerous other courts have followed the *Smith* court's reasoning.  *See, e.g.*, *Pingston-Poling v. Advia Credit Union*, 333 F. Supp. 3d 745, 749 (W.D. Mich. 2018); *Salls v. Digit. Fed. Credit Union*, 349 F. Supp. 3d 81, 91–92 (D. Mass. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 266 (D. Mass. 2019) (adopting reasoning in *Salls*, which relied on reasoning in *Smith*); *Cortes v. Univ. & State Emps. Credit Union*, Civ. No. 22-444, 2023 WL 12009972, at *10 (S.D. Cal. Mar. 13, 2023).  In sum, under *Smith*, each overdraft fee charged by the financial institution constitutes a separate violation of Regulation E. 2018 WL 16621097, at *5.

### b.   *Domann* Approach

Wings argues that the Court should adopt the approach followed by the court in *Domann*.   Wings' position is that the statute of limitations period under 5 U.S.C. § 1693m(g) begins to run "when a financial institution makes a first unauthorized transfer or charges an overdraft fee."   (Def.'s Mem. Supp. Mot. Dismiss at 27, May 13, 2025, Docket No. 6 (quoting *Domann*, 2018 WL 4374076, at *9).)   Wings argues that because Gahm alleges that her first injury occurred on March 31, 2017 (*see* SAC ¶ 70), her claim accrued on that date and expired one year later, on March 31, 2018.   Wings further contends that although Gahm references additional dates on which unlawful overdraft fees were assessed, those alleged violations all stem from a single act—the provision of an allegedly unlawful disclosure.   For these reasons, Wings argues that Gahm's claims were time-barred when she filed her initial complaint in state court on January 30, 2023.

In support of its position, Wings relies on *Domann*, which rejected *Smith*'s reasoning and determined that when a financial institution fails to provide an opt-in form that complies with Regulation E, "the alleged wrongful conduct is based on a single omission"—the failure provide the customer with a compliant form.  *Domann*, 2018 WL 4374076, at *10.  The court then concluded that there was "no basis to find that a new cause of action accrued with each new overdraft fee."  *Id.*  Other courts have rejected *Smith* and followed *Domann*.  *See, e.g*, *Radar v. Scandia Lab. Fed. Credit Union*, Civ. No. 20-559, 2021 WL 1533664, at *12 (D.N.M. Apr. 19, 2021) (holding that plaintiff's Regulation E claim was time barred and noting that the subsequent overdraft fees "were

-26-

the natural result of the allegedly infirm Opt-in Contract"); *Toth v. Scott Credit Union*, Civ. No. 20-306, 2021 WL 535549, at *8 (S.D. Ill. Feb. 12, 2021).  In short, under *Domann*, a plaintiff's EFTA claim "'occurs' (and starts the one-year clock) when the *first* overdraft fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E[.]"  *Domann*, 2018 WL 4374076, at *9.  The one-year clock does not reset "with *each* improper overdraft fee."  *Id.*

### c.    Application

After careful consideration, the Court finds the court's reasoning in *Smith* to be persuasive and concludes that each overdraft fee charged to Gahm's account amounts to a separate violation of Regulation E.  The *Smith* approach is more consistent with the plain text of 12 C.F.R § 1005.17(b)(1).  Regulation E provides that "a financial institution holding a consumer's account **shall not assess a fee or charge** on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service" unless the institution complies with the regulation's disclosure obligations.  *Id.* § 1005.17(b)(1) (emphasis added).  Based on a natural reading of this language, it follows that Wings violated Regulation E each time it assessed or charged an overdraft fee without providing its customers with a compliant opt-in form.

Gahm's initial complaint was filed on January 30, 2023.  Thus, the statute of limitations period spans January 30, 2022, to January 30, 2023.  Transactions that are alleged to have occurred before January 30, 2022, are barred.  But Gahm alleges that at

least one transaction was within twelve months of filing the initial complaint.[9]  Therefore, Gahm's EFTA and Regulation E claim is not time-barred to extent it relates to overdrafts assessed within one year of the filing of her complaint.  Accordingly, the Court will grant Wings' motion to dismiss the EFTA claim as time barred to the extent the claim relates to overdraft charges before January 30, 2022, but deny will deny the motion to dismiss the EFTA claim to the extent the claim relates to overdraft charges on or after January 30, 2022.[10]

---

[9] The SAC alleges that multiple overdraft charges were assessed on Gahm's transactions between January 30, 2022, and January 30, 2023: April 19, 2022; June 10, 2022 (three times); November 12, 2022; June 26, 2023; September 5, 2023; September 20, 2023; November 6, 2023; and December 2, 2023.  (SAC ¶ 70.)

[10] The Court briefly addresses whether the SAC appropriately relates back to the original complaint.  "[O]nce a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 437 (1974).  However, the Federal Rules of Civil Procedure specifically "apply to a civil action *after* it is removed from a state court." *Taylor v. Bailey Tool Mfg. Co.*, 744 F.3d 944, 947 (5th Cir. 2014) (citations omitted).  In other words, state procedural law governs cases originating in state court up to and until they are removed to federal court. *Winkels v. George A. Hormel & Co.*, 874 F.2d 567, 570 (8th Cir. 1989).  Accordingly, state law applies "to determine whether . . . [an] amended petition filed in state court relates back to the date of [plaintiff's] original petition." *Taylor*, 744 F.3d at 947.  In this case, the state district court concluded that the proposed SAC related back to the original complaint.  (*See* Order at 10, Apr. 15, 2025, Docket No. 1-56.)  Although the state district court stated that its ruling on the relation back issue did "not foreclose any argument on the issue of relation back that Defendant may bring in the future[,]" the Court sees no reason to disturb the state district court's initial ruling on the relation back issue.  (*Id.*)

**B.    MCFA Claim**

Gahm alleges that Wings violated the Minnesota Consumer Fraud Act when it "misrepresented its actual fee assessment practices and misled and deceived its accountholders by assessing [overdraft] fees on transactions that did not actually overdraw the account or that did not overdraw the account at authorization."  (SAC ¶ 131.)  The MCFA bars

> [t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby[.]

Minn. Stat. § 325F.69, subd. 1.  The MCFA "should be liberally construed in favor of protecting consumers."  *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000).

Because Gahm's MCFA claim sounds in fraud, it is subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b), and "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Defendants must be able to "respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct."  *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).  In other words, "the complaint must identify the 'who, what, where, when, and how' of the alleged fraud."  *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (citation omitted).

At this stage in the proceedings, the Court is satisfied that Gahm has met her pleading burden under Rule 9(b) and Rule 12.  The SAC sufficiently alleges that Wings defrauded or misled consumers under the MCFA by misrepresenting its fee practices. Gahm alleges the Opt-in Form failed to define "non-sufficient funds" or to clarify whether an overdraft is created when the actual balance or the available balance is overdrawn. The meaning of non-sufficient funds is further obscured by the fact that Wings' website page explained that "Overdraft Protection Plus is designed to cover the payment of checks and ACH debits, even when [the customer's] **current balance** is insufficient" and that customers "can opt in to have debit card transactions and ATM withdrawals covered."  (SAC, Ex. G.)  Again, the website makes no reference as to whether "current balance" means actual or available balance.  The SAC also alleges the Opt-in Form fails to explain when the overdraft determination is made—at authorization or settlement. Taken together, the SAC makes clear that a customer, after reading the Opt-in Form, could unexpectedly be charged an overdraft fee even when the account contains sufficient funds at the time of authorization.

In addition to the Opt-in Form, the A&D Form is also sufficiently ambiguous to state an MCFA claim.  For instance, the A&D Form initially states that the customer grants Wings permission "to pay or authorize transactions against **non-sufficient funds** up to your approved limit."  (SAC, Ex. F (emphasis added).)  It then provides that "Wings is not obligated to pay any item presented for payment if [the customer's] account does not

-30-

contain sufficient **collected** funds." (*Id.* (emphasis added).)  The A&D Form then proceeds to discuss and define the "actual balance" and "available balance." (*Id.*)  In light of the A&D's shifting terminology, Gahm plausibly alleges that the A&D Form is ambiguous as to how Wings determines when overdrafts will be assessed.

Given the ambiguities presented in the Opt-in Form and the A&D Form, the Court concludes that Gahm has pled sufficient factual allegations to state an MCFA claim under Rule 12.  The Court also concludes that Gahm has alleged her MCFA claim with the requisite particularity under Rule 9(b).  Gahm adequately specifies who committed the alleged fraudulent or deceptive practice, what the practice entailed, how it was executed, where it took place, and when it occurred.  Accordingly, the Court will deny Wings' motion to dismiss the MCFA claim.

## CONCLUSION

Gahm brings claims under (1) the EFTA and Regulation E and (2) the MCFA.  Wings moves the Court to dismiss Gahm's Second Amended Complaint under Rule 12(b)(6) for failure to state a claim.  The Court will grant the motion in part and deny it in part. The Court will grant Wings' motion in part because Gahm's EFTA and Regulation E claim is time barred to the extent the claim relates to overdraft charges assessed before January 30, 2022.  The Court will deny Wings' motion with respect to EFTA claims assessed on or after January 31, 2022, because these claims are not time-barred, and Gahm plausibly alleges a Regulation E violation.  Finally, the Court will deny Wings' motion as to the MCFA

-31-

claim because Gahm plausibly alleges fraudulent, misleading, or deceptive business practices, and she does so with the required particularity.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Wings Financial Credit Union's Motion to Dismiss (Docket No [4]) is **GRANTED in part and DENIED in part, as follows**:

1. With respect to Count 1, Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* and Regulation E, 12 C.F.R. § 1005 *et seq..*, the Motion is **GRANTED** to the extent Count 1 is based on overdraft fees charged before January 30, 2022, but **DENIED** in all other respects.

2. With respect to Count 2, Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq.*, the Motion is **DENIED**.

DATED:  March 31, 2026          _____/s/ John R. Tunheim_____
at Minneapolis, Minnesota.          JOHN R. TUNHEIM
                                              United States District Judge

-32-